CADWELL v. PENINSULAR STATE BANK.

1. BAILMENTS—GRATUITOUS BAILEE—BANKS AND BANKING.
An officer of a bank with whom was deposited preferred corporate stock under an arrangement with the corporation and purchaser by which the purchaser was to pay for same when sold and was to have as a bonus a certain number of shares of common stock likewise deposited, such officer to account to the corporation for the price of the preferred stock when sold and to such purchaser for the shares of common stock, is merely a gratuitous bailee where he neither asked, nor was promised, nor received any compensation or payment of any kind for his acts in protecting the rights of the subsequent purchaser of such common stock from another person.

2. SAME—GOOD FAITH—NEGLIGENCE—GROSS NEGLIGENCE.
Where a contract of bailment is for the sole benefit of the bailor, the bailee is only required to act in good faith, and he is consequently responsible for nothing less than gross neglect.

3. SAME.
A gratuitous bailee with whom money was deposited for the purpose of paying for stock held by him for another was not guilty of gross negligence in paying the money to the supposed owner of the stock where he had no knowledge that the stock belonged to another person, and the supposed owner, upon inquiry, informed him that the stock belonged to him.

Error to Wayne; Davis, J., presiding. Submitted October 9, 1916. (Docket No. 73.) Decided March 30, 1917.

Assumpsit by E. B. Cadwell and Howard Brooke, copartners as Edwin B. Cadwell & Company, against the Peninsular State Bank and John H. Johnson on

the common counts.  Judgment for defendants on a directed verdict.  Plaintiffs bring error.  Affirmed.

*J. O. Murfin,* for appellants.

*Donnelly, Lyster, Brennan & Munro,* for appellees.

STEERE, J.  Plaintiffs Cadwell and Brooke were engaged, during the year 1910, in the brokerage business in the city of Detroit as partners under the firm name of Cadwell & Co.  The Peninsular State Bank, defendant, was a corporation engaged in the banking business in said city, and defendant Johnson was its president.  In May of that year plaintiffs sent their certified check for $785 to Johnson to apply on a purchase of 10 shares of General Motors Company stock in his hands or under his control, which they claim he paid to the wrong party, to their loss and contrary to instructions.  They subsequently brought this action in assumpsit to recover from him that sum.

In the spring of 1910 one H. W. Watson, of Flint, Mich., made an arrangement with the General Motors Company, by which he subscribed for 600 shares of its preferred stock at $100 per share, with the understanding he should market it in the city of Detroit, paying for the same as sold.  With the preferred stock, as sold by the company to him, went a bonus of 20 per cent. common stock, or 120 shares.  With the assistance of his brother-in-law, C. C. Hyatt, a broker of Detroit, Watson sold this block of stock in Detroit, mostly to brokers on a bonus basis of 15 per cent. common stock.  This left 30 shares of common stock which belonged to him.  For the convenience and protection of both parties, it was arranged that a block of stock of the amount subscribed for by Watson should be sent to defendant Johnson and held by him, he to procure of the Motors Company from time to time certificates for the requisite number of shares of

stock according to sales made by Watson, and deliver them when paid for to purchasers as Watson directed, it being understood and agreed between the parties that Johnson should account to the Motors Company for the stipulated price of the preferred stock when sold and to Watson for the remaining 30 shares of common stock which would belong to him after the other was sold. Hyatt testified that for assisting in selling this stock Watson agreed to give him one-half, or 15 shares, of the common stock which would remain to Watson. Of this, if true, Johnson was not advised by Watson and had no knowledge.

The preferred stock, with its 15 per cent. bonus of common stock, was all sold or contracted for by April 23, 1910. Plaintiffs had previously purchased some of the preferred stock, over which at first there had been some misunderstanding and delay owing to the certificates first sent out being marked as not transferable. On April 23d they were solicited by Hyatt to buy 10 shares of the common stock yet in Johnson's hands, which he claimed to own and they agreed to buy provided he furnished an order from Watson for its delivery to them. He then procured the following memorandum from Watson:

"I agree to deliver to the account of E. B. Cadwell & Co. for the account of C. C. Hyatt ten shares of General Motors stock, as soon as the stock certificates are delivered to me."

Brooke, who conducted the business for plaintiffs, testified that he saw Johnson that afternoon and showed him this "order and agreement" from Watson, and asked him "if he would deliver the stock upon that order" as he did not care to make a contemplated payment to Hyatt until he learned from Johnson that it "would be forthcoming when properly transferred," to which the latter replied "he would deliver it on Mr. Watson's order." On May 7, 1910, plaintiffs wrote Watson as follows:

"May 7, 1910.

"MR. HARRY F. WATSON,
 "Flint, Michigan.

"*Dear Sir:* Under date of April 23d you gave us your written agreement to deliver us 10 shares common stock of the General Motors Company as soon as your application of the stock now in was delivered to you, said stock being for the account of Mr. C. C. Hyatt. We understand that this has been delivered to you, and we hereby make demand upon you for said delivery. Yours," etc.

Brooke testified that Johnson had said if any action by him was desired to "put the matter in the shape of a letter so he would have his instructions," in compliance with which requirement he dictated and sent the following letter, with check inclosed:

"May 9, 1910.

"MR. J. H. JOHNSON, President,
 "Peninsular Savings Bank,
  "City.

"*Dear Sir:* In further reference to our recent purchase, through you, of General Motors stock, we take the liberty of inclosing herewith a copy of an agreement signed by H. W. Watson, for the delivery to us of ten shares of common stock of General Motors Company, for the account of C. C. Hyatt, upon which you will note that we have advanced to Mr. Hyatt $250, the total purchase price of the ten shares being $1,035.

"We inclose herewith our certified check for $785 payable to your order, being the balance due on this purchase, and beg to ask that before this matter is closed and any portion of the money or stock is delivered that you will see we are protected in the delivery of this ten shares of common stock.

"For your information, beg to advise that Mr. C. C. Hyatt has informed us that the ten shares in question is the portion of the common stock now in your hands to be delivered to Mr. Watson, being the part of the unsold bonus common stock accompanying the preferred, in excess of the 15 per cent, which was delivered with said preferred. Thanking you for your courtesy and attention to this matter, we remain," etc.

On the same date Johnson replied as follows:

"DETROIT, May 9, 1910.
"MESSRS. E. B. CADWELL & CO.,
    "Detroit, Mich.
    *"Gentlemen:* We beg to acknowledge yours 9th inst. in re General Motors stock of H. W. Watson. We also have your certified check, $785, in connection therewith.
    "We will make every effort possible to protect you in this matter, but of course cannot promise definitely as Watson may have assigned his rights to a third party. We will keep you promptly advised of his moves.
                "Very truly yours,
                    "J. H. JOHNSON, President."

Two days later plaintiffs wrote Johnson two letters as follows:

                "DETROIT, May 11, 1910.
"MR. J. H. JOHNSON, President,
    "Peninsular Savings Bank,
        "City.
    *"Dear Sir:* Under the advice of our attorney, we are sending you formal notice in connection with the ten shares of General Motors common, which we would ask you to attach to your files in connection with the matter. We are also writing Mr. Watson asking him to settle the matter by the end of this week.
                "Yours very truly,
                    "E. B. CADWELL & CO."

                "DETROIT, May 11, 1910.
"MR. J. H. JOHNSON, President,
    "Peninsular Savings Bank,
        "City.
    *"Dear Sir:* Referring to your favor of May 9th, in connection with our purchase from H. W. Watson of 10 shares of General Motors common stock, we beg to advise you that we will not recognize the validity of any transfer or assignment by Mr. Watson to a third party, of this stock, and further, that we will take steps to protect our rights against any such claim of ownership by a third person. We will appreciate

it if you will keep us advised of any developments as indicated in your recent letter, and in the meantime beg to remain,

"Yours very truly,
"E. B. Cadwell & Co."

A certificate for 10 shares of stock bought from Hyatt by plaintiffs as stated was delivered to them by Johnson on June 1st, and the $785 check received was credited to Watson, who had told Johnson the stock belonged to him, and, when asked about the $250 advanced to Hyatt, said:

"I will settle that with Hyatt. Give me that check of $785, and deliver the stock to Cadwell."

In due course of business and time Johnson accounted to and settled with the General Motors Company for the preferred stock and Watson for the surplus 30 shares of common stock, as it had been arranged he should do.

A couple of years later Hyatt made a demand on plaintiffs for the $785 which he claimed was yet due him for the 10 shares of stock he sold them, and later brought an action against them in which he recovered judgment for the same. Brooke testified that he first heard the money had not been paid to Hyatt when this demand was made, and Johnson testified that he did not know of any claim that the money belonged to Hyatt until Brooke so informed him at about that time. Watson died April 7, 1913, and this action was begun October 14, 1914. At conclusion of the testimony the trial court held plaintiffs had failed to make out by their proofs a *prima facie* cause of action, and directed a verdict for defendants.

Johnson testified, and it is not disputed, that he neither asked, was promised, nor received any compensation or payment of any kind for what he was to do or did in this matter for plaintiffs. His testimony and the circumstances attending the transaction

stamp him as a gratuitous bailee in that connection, or one acting without charge for the sole benefit and accommodation of the party whose property he receives in custody, involving the lowest degrees of responsibility in the triple division of neglects in bailments. Of the responsibility involved in such cases, it is said in Jones on Bailments (1836), p. 21:

"In contracts which are beneficial *solely* to the owner of the property holden by another, no more is demanded of the holder than *good faith,* and he is consequently responsible for nothing less than *gross* neglect."

In *National Bank* v. *Graham,* 100 U. S. 699, it is held that gross negligence on the part of a gratuitous bailee amounts in legal effect to fraud. In Cooley on Torts (2d Ed.), p. 753, it is said, in discussing the degrees of bailment:

"While if it were for the benefit of the bailor exclusively, the bailee is chargeable only with such slight care as a man of common sense, however inattentive, would give to his own affairs."

While various legal points are raised and argued, we think the controlling question in this case is whether, by the standard of negligence applicable to a gratuitous bailee, there is any testimony in the record from which a jury could legally find gross negligence on the part of Johnson in paying the money in question to Watson, under his then knowledge of the situation and the instructions given him in plaintiff's letter of May 9th, which it is claimed he violated. Brooke in so asserting and construing the letter testified that it "specially stated for whose account the money was deposited by (with) Johnson," and when asked, "So, if there is anything specific, it is in this letter, isn't it?" he answered, "Yes, but you must consider the whole letter, and not part of it," saying later in explanation:

"We wanted Mr. Johnson to see that the stock was delivered to us for the money which we had paid, which he agreed to do when Hyatt and Johnson and I went in the bank."

The weakness of this contention is that nowhere in conversation or correspondence did plaintiffs specifically direct Johnson as to whom the money should be paid, nor tell him Hyatt owned the 10 shares of stock, but in their solicitude to secure its delivery to them emphasized that feature of the transaction and so wrote that he would naturally and might reasonably infer they sought his aid to get it, not from Hyatt, but from Watson who yet owned it. Johnson's answer to their letter of May 9th indicates that he so understood it. The stress of that communication is to secure for them delivery of the stock, and such is the burden of their two letters of May 11th, as well as the talk on April 23d, of which Brooke testified:

"We wanted to be sure we got the stock. That was practically the substance of my conversation with him. * * * I knew it would be delivered through the bank. I knew Mr. Watson was the party who was supposed to have the right to sell and make delivery of the stock, either he or on his order."

That this thought was paramount in his mind runs through the letters and is emphasized by his testimony in the suit between Hyatt and plaintiffs, where he answered as follows:

"Q. And you asked that Mr. Johnson would see that you were protected in delivery of the ten shares of common stock?
"A. Yes.
"Q. So the stock would be delivered to you on the $785, is that the reason? * * *
"A. We had paid $250, and could not get the stock.
"Q. You wanted to be protected on the $785?
"A. We had no interest in the money—we wanted the stock."

In that portion of the letter of May 9th, referring to the inclosed check, plaintiffs say:

"We beg to ask that before this matter is closed and any portion of the stock is delivered, that you will see we are protected in the delivery of this ten shares of common stock."

For his information they state:

"Mr. C. C. Hyatt has informed us that the ten shares in question is the portion of the common stock now in your hands to be delivered to Mr. Watson."

And on May 11th, referring to their letter of May 9th, they say:

"In connection with our purchase from H. W. Watson of ten shares of General Motors common stock, we beg to advise you that we will not recognize the validity of any transfer or assignment by Mr. Watson to a third party of this stock."

Johnson in his trusteeship was receiving money for the stock in his custody as sold, obtaining certificates therefor, and accounting only to the General Motors Company and Watson. He states:

"I did not deal with the purchasers at all. All I had to do, if their checks came in, was to direct a certificate to be made out and delivered. Deals with persons were made by Mr. Watson or his agents so far as I know."

Hyatt, called by plaintiff, testified:

"I never had any discussion with Mr. Johnson in regard to the ten shares of stock which I claim I sold Cadwell & Co."

Johnson had the custody of 30 shares of common stock for which he was accountable to Watson only, and had told plaintiff he would deliver the 10 shares to them on Watson's order. Plaintiff's letters fairly indicated they were buying the 10 shares from Watson, and when in their letter of May 9th they sent

him their check in payment of the balance for these 10 shares without any specific directions as to whom he should pay it, "with a copy of an agreement signed by H. W. Watson for the delivery to us of ten shares of common stock of General Motors Company for the account of C. C. Hyatt," to whom the check was not made payable and of whose relation to the transaction Johnson was not advised, it cannot be said that, as the matter was then understood by and presented to him, he failed to exercise the slight degree of care required of a gratuitous bailee, or was guilty of gross negligence, in assuming the money was for Watson, who so asserted and on whose order he acted, or in paying it to him in order to release for plaintiffs the stock which they were importuning him to secure for them.

In its entirety this record fails to furnish testimony from which a jury could legally find evidential support for a verdict, based on failure to exercise such slight degree of care as even the most inattentive and thoughtless never fail to take of their own concerns, and which must amount to gross negligence, in legal effect fraud, to constitute a violation of the gratuitous bailment disclosed.

The judgment is affirmed.

KUHN, C. J., and STONE, OSTRANDER, BIRD, MOORE, and BROOKE, JJ., concurred. PERSON, J., did not sit.